IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JOSÉ C. LLORENS; PHARMACEUTICAL GENERIC DEVELOPERS, INC. | CIVIL ACTION NO. |
| Plaintiffs | DERIVATIVE STOCKHOLDER'S SUIT FOR DAMAGES FOR BREACH OF FIDUCIARY DUTIES; STOCKHOLDER'S SUIT FOR DAMAGES FOR BREACH OF FIDUCIARY DUTIES AND STOCKHOLDER'S AGREEMENT |
| vs. | |
| RAFAEL L. ARRIBAS, JR. | |
| Defendant | PLAINTIFFS DEMAND TRIAL BY JURY |

## COMPLAINT

TO THE HONORABLE COURT:

Plaintiff, José C. Llorens ("Llorens"), through undersigned counsel and on behalf of Pharmaceutical Generic Developers, Inc. ("PGD"), most respectfully states and prays:

## PARTIES

1.      Plaintiff, Llorens, is a citizen and a resident of the Commonwealth of Puerto Rico.

2.      PGD is a corporation organized pursuant to the laws of the Commonwealth of Puerto Rico with its principal place of business in Puerto Rico.  PGD is an involuntary plaintiff on whose behalf and for whose benefit the derivative stockholder's claims of this complaint are made.

3.      Defendant, Rafael L. Arribas, Jr. ("Arribas"), is a citizen and a resident of the State of Florida.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(a)(1) as it involves matters in controversy that exceed the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.      Pursuant to 28 U.S.C. §1391, venue lies in the U. S. District Court for the District of Puerto Rico as it is a judicial district in which a substantial part of the events or omissions giving rise to the present claims occurred and where a substantial part of property that is the subject of the action is situated.

## DEMAND FOR JURY TRIAL

6.      Plaintiffs demand a jury trial with respect to all issues so triable.

## SPECIAL PLEADINGS RELATED TO DERIVATIVE STOCKHOLDERS SUIT

7.      Llorens is a stockholder of 50% of the stock of PGD and fairly and adequately represents the interests of the only stockholder (himself) similarly situated in enforcing its rights.

8.      Llorens is and was a stockholder of PGD at the time of the transactions and occurrences complained of herein.

9.      This action is not collusive nor intended to confer jurisdiction that the court would otherwise lack.

10.     On February 22, 2013, in writing, and thereafter personally, Llorens requested that the present management of PGD, Eduardo Zayas, Esq. ("Zayas"), the court appointed judicial administrator of PGD, directly bring this action on behalf of the corporation, and to this date he has not.

2

11.     Upon information and belief, the interests of PGD'S management are not adverse to the derivative stockholder's claims made herein.

## FACTS COMMON TO ALL CAUSES OF ACTIONS

### Regarding the Puerto Rico pharmaceutical industry and Llorens' beginnings therein

12.     Plaintiff Llorens has been engaged in the pharmaceutical industry in Puerto Rico since at least 1986 when he organized Llorens Pharmaceutical, Inc. ("Llorens Pharmaceutical") to sell generic prescription medications in Puerto Rico.

13.     Medications that require a physician's prescription are termed "ethical" or "RX" in the industry.

14.     The marketing of RX medications usually requires costly direct promotions to physicians and hospitals, and the payment of commissions to salesmen.

15.     In or around 1996, Llorens became aware of the existence of a market for generic substitutes of certain RX medications popular in Puerto Rico.

16.     When an RX medication is prescribed, the dispensing pharmacy is required to offer less costly generic substitutes to the patient.  Thus, substitute generic products have a competitive advantage over the costlier RX medications they substitute.

17.     Llorens initially commenced to distribute substitute generic RX brands through Llorens Pharmaceutical.

18.     Given the different methods of distribution, Llorens eventually decided to form a separate operation for the sale of substitute generic brands and retained defendant Arribas, at the time a well-known sales representative doing business as Arribas & Asociados.

19.     Through Llorens Pharmaceutical, Llorens initially paid Arribas a sales representative commission of between $3 and $4 for each unit sold.

**Regarding the Formation and Organization of PGD**

20.     Llorens and Arribas eventually decided to share the risks and profits of the operation by forming a corporation (PGD) for that purpose, with each as a 50% stockholder.

21.     Upon the formation of PGD, Llorens had by then already developed the following substitute generic products registered in Llorens Pharmaceutical's name with the Puerto Rico Department of Health: Genetuss, Clusinex, Genebron DM, Sudatuss-SF, and Sudatuss-2.

22.     In April of 1998, Llorens and Arribas incorporated PGD initially as Eckerd-Thrift (PR) Drug, Inc. to continue the operations commenced by Llorens Pharmaceutical. They were later required to change the name of the corporation as it was similar to a previously registered one.

23.     The certificate of incorporation of PGD specified that the management of the affairs of the corporation would be the responsibility of its board of directors, that its directors need not be stockholders, and that the "number of Directors" would be determined "by and in the manner provided for in the by-laws of the Corporation". The certificate names Llorens and Arribas as directors and states that they would remain as such, "until the first annual meeting of stockholders or until their replacements substitute them."

24.     PGD never held a first "annual meeting of stockholders" as such, and never adopted corporate by-laws. No minutes ever existed of any meetings, be they of stockholders or directors.

25.     PGD's Certificate of Incorporation also specifies that the directors of the corporation will be personally liable for damages caused by any breaches of their fiduciary duties if (1) they involved a breach of a director's duty of loyalty to the corporation or its stockholders, or if, they involved (2) bad faith, intentional acts or omissions, or were knowingly made in violation of law, or if they involved (3) any duties under Article 5.22 of Puerto Rico's General Corporations Law of 1995, or (4) any transaction in which the director derived undue personal gain.

**Regarding the Operation of PGD**

26.     Good relations existed between Llorens and Arribas during the first seven (7) years of the existence of PGD permitting the two partners to operate its business in an informal manner through consensus.

27.     Initially, Arribas and Llorens usually met personally and weekly concerning the management of PGD. Arribas moved to Miami in 2003 and thereafter, meetings were usually conducted on a weekly basis by telephone.

28.     By 2005, the business of PGD was a commercial success that involved minimal operational costs as it was basically run by Arribas from his home with a telephone and a fax.

29.     By warehousing products with a wholesale druggist ("droguería") that also delivered the products directly to PGD's pharmacy clients, PGD was not required to invest in warehouses or vehicles, nor pay commissions to salesmen.

30.     Historically and until 2006, PGD's General and Administrative costs ("G&A") fluctuated between only four to six percent (4% to 6%) of yearly sales.

31.     It was always the intent, practice and agreement of the stockholders of PGD, that any resulting net income would always be distributed in equal shares amongst them ("the Stockholder's Agreement").

32.     Arribas was appointed "President", Llorens "Vice President" and "Treasurer", Elsa Naranjo (Arriba's spouse) "Secretary", and Thusnelda Ruiz (Lloren's spouse) "Assistant Secretary".

**Regarding the 2005 Supplier Crisis**

33.     In 2005, the Federal Drug Administration ("FDA") issued new guidelines that changed labeling requirements for certain generic medications.

34.     Thereafter, FDA guidelines required that some of PGD's products, previously sold as RX, thereafter had to be sold as over-the-counter products ("OTC").

35.     Concurrently, PGD experienced problems with its suppliers.  A supplier of liquid capsules, Swiss Caps, ended its relationship with PGD due to a litigation between them. Another supplier, Lex Laboratories, closed to remodel its laboratory in 2005, and a third, Pharmakon, had to suspend a great part of its operations as a result of an injunction issued in July of 2005 by the U.S. District Court in Tampa, Florida, prohibiting it from manufacturing or distributing any medications until it complied with a specified improvement plan ("the FDA injunction").

36.     Because PGD had to find substitute manufacturers, Arribas and Llorens agreed to take measures to insure its survival by, among other things, not taking any more salaries or other income from the company until they agreed the situation improved.

**Regarding the "Rábano Yodado" Incident**

37.     On November 16, 2005, while Pharmakon was under the FDA injunction, Llorens Pharmaceutical ordered from it 2,903, 8oz. bottles of "Rábano Yodado", on PGD's behalf and for delivery to PGD. "Rábano Yodado" was an OTC product sold by PGD categorized as a nutritional supplement, and not as a generic RX medication. Pharmakon's injunction did not prohibit it from producing and selling that type of product.

38.     On December 6, 2005, Arribas telephoned Llorens, falsely accusing him of stealing corporate opportunities and calling him a "traitor" because he had ordered "Rabano Yodado" through Llorens Pharmaceutical.

39.     Arribas then called Nelly Ruiz, Llorens' spouse, at her home, repeating his accusations that her husband was a "traitor" who stole corporate opportunities.

40.     On December 12, 2005, Arribas repeated his accusations in a letter he addressed to Mrs. Llorens, again calling her husband a "traitor". Arribas also sent copies of the letter to Karen Llorens, Lloren's minor daughter, and to Llorens' father, Carlos Llorens.

41.     Arriba's outrage was supposedly triggered by the "Rabano Yodado" order placed through Llorens Pharmaceutical.

42.     Upon information and belief, in the context of PGD sales of $979,747 in that year, Arribas' reaction over a $3,000 order was intended to destroy and end their relationship and force the purchase of his shares in PGD by Llorens.

43.     In his December 12, 2005 letter to Mrs. Llorens, Arribas made additional false claims regarding her husband. He claimed that Mr. Llorens was disloyal by allegedly

having a proprietary interest in a competing generic medications company ("Progen") organized by a Mr. Radamés Santiago in 1999.  He also falsely claimed therein that Llorens Pharmaceutical stole another corporate opportunity by selling the nutritional supplement "Proteinex" instead of through PGD and demanding that Llorens disgorge all income obtained by Llorens Pharmaceutical in its sale of that product.  Arribas further claimed therein that Llorens interfered with PGD's contractual relationship with Pharmakon, causing Pharmakon to terminate its supplier relationship with PGD.

44.    On December 20, 2005, Llorens wrote Arribas expressing his concern that Arribas had involved his wife and minor daughter in the matter, requesting a simple apology to continue as partners.  Otherwise, Llorens proposed they should decide "what to do equitably with PGD".  Arribas refused to apologize, repeated his false accusations, and offered to sell his shares to Llorens for $2,500,000, and to divide amongst themselves, any recovery from the Swiss Caps case, when and if it occurred.

45.    In all negotiations to reach an agreement to liquidate and divide the business, Arribas' consistent position was that Llorens, either had to pay him the $2,500,000 for Arribas' shares, or had to convey his own shares and interest to Arribas <u>for nothing</u>. This obviously led to a deadlock, as the partners could not agree on how to liquidate and divide the business.

**Regarding Llorens' Resignation as an Officer and Director**

46.    Arribas' false accusations were compounded by his insistence that Llorens was liable to PGD for damages that allegedly resulted from the conduct he falsely charged.

8

47.     Arribas further affected the relationship by not providing Llorens with information concerning the finances and affairs of PGD required to discharge his duties as a director and officer.

48.     Given the foregoing situation, on June 28, 2006, Llorens resigned his positions as a director and officer, as did Mrs. Llorens regarding her position as an officer.

**Regarding the Litigations**

49.     Because of the impasse regarding the dissolution of PGD, on August 2, 2006, Llorens filed an Application for Corporate Dissolution before the Court of First Instance of the Commonwealth of Puerto Rico in Civil Case KAC-2006-4469 (505), wherein he requested the dissolution of PGD pursuant to Section 9.03 of the General Corporations Law of Puerto Rico (the "Corporate Dissolution case").

50.     Nine (9) days thereafter, Arribas, by then in full possession of all of PGD's assets and operations, had PGD file a lawsuit against Mr. and Mrs. Llorens and Llorens Pharmaceutical, Inc., in Civil Case KAC 2006-4735 before the Court of First Instance of the Commonwealth of Puerto Rico claiming a total of $1,700,000.00 in damages ("the PGD lawsuit"). Arribas never sought Lloren's approval nor his consent to file the case nor to finance it with PGD funds that belonged to both of them.

51.     In the PGD lawsuit, Arribas falsely claimed that Llorens had breached his fiduciary duties as a corporate director and officer, repeating the same false accusations made in his December 12, 2005 letter to Mrs. Llorens', regarding the Rábano Yodado order, Proteinex, Progen, and Pharmakon.

52.     As the remaining director and president of PGD, Arribas had a duty to seek legal advice regarding any legal claims or defenses raised by the corporation.

9

53.     He was also duty bound as an officer and director to avoid any conflicts of interest in the discharge of his duties and the use of corporate funds.

54.     With regard to both the Corporate Dissolution case and the PGD lawsuit, PGD, Arribas, and PGD's counsel, were required to determine, upon a reasonable investigation, whether any claims or defenses of PGD were well grounded on the facts and applicable law, and not presented with the purpose of causing oppression of a stockholder of PGD, to whom fiduciary duties were owed.

55.     Without regard to any conflict of interests, and in bad faith, Arribas instructed both his own, and PGD's attorneys, to oppose the Corporate Dissolution lawsuit, although that was the remedy required by law for PGD's schism. Also without regard to any conflicts of interest, and in bad faith, Arribas instructed PGD's attorneys to vigorously pursue his specious claims against the Llorens, fully funded by PGD.

56.     Upon the formation of PGD, and during its operations, at no time did Llorens ever agree with Arribas, or with PGD, that funds or assets of the corporation could be used to finance the filing of lawsuits against either of them.

57.     Although the Corporate Dissolution lawsuit offered, as required by the statute, a fair and equitable plan to liquidate and distribute the corporation's existing assets among its two stockholders, Arribas vigorously opposed that relief, causing the dissolution suit to fester for five (5) long years in Puerto Rico's legal system, during all of which time Arribas controlled and operated PGD for his exclusive benefit.

**Regarding Arribas' Disloyal Operation of PGD**

58.     After his resignation as a director and officer of PGD, Llorens wrote Arribas as PGD's President and remaining Director, and requested that an annual meeting of

stockholders be held, among other things, for the election of a director to replace him. Arribas was duty bound to consult with corporate counsel concerning that request for an annual stockholder meeting, and how to elect a substitute for Mr. Llorens on the board. Plaintiff believes that Arribas, either failed to seek advice of counsel concerning any such duties and/or he disregarded such advice.

59.     Arribas and PGD never held, or even programmed, any annual meeting of stockholders, and completely ignored Mr. Llorens' request.

60.     After Lloren's resignation, Arribas proceeded to breach and disregard the agreement he reached with Llorens that no salaries or other income would be drawn from the corporation until they agreed that the supplier situation was favorably resolved.  He also disregarded the previous Stockholder's Agreement to the effect that if net proceeds were to be distributed in any way they would be shared in equal parts, including any compensation received by way of salaries, expenses, or other benefits.

61.     Based on what financial information Plaintiff possesses to date, between 2006 and 2012 it appears that Arribas collected at least $895,745 in payments from PGD for salaries, rent, a management fee, a loan, and for other concepts.  Meanwhile, Plaintiff received nothing and was offered nothing.  Arribas also incurred in legal and professional expenses of $554,699 for the period, mainly in connection with the PGD and Corporate Dissolution lawsuits.

62.     PGD's reported financials from 2006 until 2012 reflect that Arribas increased the administrative expenses of PGD by paying himself proportionately higher salaries and other direct and indirect compensation than in any previous years of PGD's operations. During that period of time, Arribas paid his own company, Arribas &

Asociados, a total of $422,000 for "management fees". Between 2006 and 2012, Arribas conducted the affairs of PGD deviating from the customary uses and practices of the company. During that period of time, G&A increased from the historical four to six percent (4% to 6%) of sales, to between 49.47% to 279.08%.

63.     Upon information and belief, in breach of his fiduciary duties, Arribas used funds, assets and resources of PGD for his personal business, and also used corporate employees to perform personal services for him such as acting as a chauffeur, messenger, and to monitor and maintain his properties in Puerto Rico. Between 2006 and 2012, PGD reported a total of $58,092 in "motor vehicle expenses" when PGD's operations did not require any vehicles for its operations. During that period, Arribas paid himself a total of $84,000 for "rent" when prior to 2006 the corporation paid nothing for that concept.

64.     During the pendency of the Corporate Dissolution case, PGD settled its claim against Swiss Caps without ever consulting with Llorens or obtaining his consent. Upon information and belief, PGD received a total of $500,000 from Swiss Caps in that settlement. To this date, Arribas and PGD have refused to provide Llorens with information concerning that settlement, and of the use of those proceeds.

**Regarding the Litigation Judgments**

65.     Arribas' spurious opposition to the Corporate Dissolution lawsuit led to the summary proceedings sought there being delayed and finally denied on September 16, 2008, on erroneous grounds advanced by Arribas' attorneys. On December 19, 2008, the Court of Appeals reversed and entered summary judgment, ordering the immediate dissolution of PGD. Not content, Arribas appealed, but on December 27, 2011, the Puerto Rico Supreme Court affirmed the Court of Appeals' order of dissolution.

66.    On November 30, 2012, the Court in the Corporate Dissolution case ordered the appointment CPA Eduardo Zayas ("Zayas") as judicial administrator for PGD to proceed with its dissolution.  The Court also ordered that PGD deliver its financial books and records to Mr. Zayas.  Arribas initially refused to cooperate with Mr. Zayas, and resisted delivering corporate assets to him and producing company financials and records, as ordered.

67.    While under the compulsion of an order issued by the Court in the Corporate Dissolution lawsuit, to cease all operations and deliver control of PGD and its assets to Mr. Zayas, Arribas refused to do so, and between August and October of 2012, disbursed a total of $98,372.34 in PGD funds, including a total of $74,000.00 he paid to himself or his business, Arribas & Asociados.  He also had the corporation lend himself $100,000 which he has never repaid and retained $64,426.53 in corporate funds which he never deposited in PGD's account, and wrongly retains to this date.  Arribas refuses to reinstate the funds in question.

68.    After a trial during which PGD and Arribas had a full and fair opportunity to present PGD's case, on September 18, 2012, the Court in the PGD lawsuit entered judgment dismissing PGD's complaint in its entirety, and ruling that PGD had <u>no factual basis</u> for any of its claims against Mr. Llorens.  The Court subsequently entered a ruling finding that PGD and Arribas had been obstinate in filing and prosecuting their claims.

69.    Upon information and belief, during his tenure as an officer and director of PGD, and in breach of his fiduciary duties as such, Arribas organized an entity in Florida by the name of "Pharmaceutical Generic Developers USA" or "PGD USA", and sought the registration of PGD products in the name of that entity.

## FIRST CAUSE OF ACTION
### (Derivative Stockholder's Suit)

70.     The foregoing allegations are incorporated and repeated in connection with this First Cause of Action.

71.     Arribas breached his fiduciary duties as a director and officer of PGD by breaching his duty of loyalty to the corporation and its stockholders.

72.     Arribas had a duty to exercise good faith and avoid conflicts of interest to ensure that PGD was operated in a diligent and honest manner for the benefit of both of its stockholders.

73.     Arribas knew, or should have known, that by operating PGD without Llorens' consent and participation, and by engaging in self-dealing transactions with PGD for undue personal gain, he improperly and illegally increased the costs of PGD's operations, to PGD's detriment and that of its stockholders.

74.     Arribas abused his position of trust as a PGD director and officer and engaged in a conflict of interests by unilaterally conducting the affairs of PGD (for his own benefit) and refusing to hold annual stockholder's meetings required by law, notwithstanding Llorens' several written requests for such meetings.

75.     Arribas further abused his position of trust as a PGD director and officer, and engaged in a conflict of interest, by using the funds and assets of the corporation to finance the PGD lawsuit in order to persecute, oppress and damage a fellow stockholder, and to vigorously oppose on behalf of PGD, the reasonable and proper dissolution procedures mandated by law initiated by Llorens as a stockholder.

76.    Arribas further abused his position of trust and breached his duty of loyalty to PGD and its stockholders when he appropriated PGD's name and products in Florida on behalf of another entity that he created for that purpose.

77.    Arribas further abused his position of trust, and breached his duty of loyalty to PGD and its stockholders, by not declaring and paying dividends, nor allowing Llorens to share in any net income of the corporation.

78.    Without full and current financial disclosures, Plaintiff has been unable to determine the exact damages the foregoing breaches of Arribas' fiduciary duties as a director and officer of PGD have caused. Information to date reflects that as of December 31, 2012, Arribas caused at least the following damages to PGD, among others:

(a)    Reduced PGD's net worth by $1,574,060, as of December 31, 2012;

(b)    Thereafter, caused additional operational losses to the corporation that produced its insolvency, as of the date of the filing of the present Complaint;

(c)    Loss of the $500,000 of the Swiss Caps settlement proceeds;

(d)    Unjustified and unauthorized salaries, rentals, expenses and loans received by Arribas from PGD that totaled, as of December 31, 2012, at least the sum of $895,745;

(e)    Damages for lost earnings represented by all sales made by PGD-USA of PGD products, such gains needing to be accounted for and their amounts determined upon discovery;

(f)    The sum of $587,101 for the sums expended by PGD in legal and professional fees expended primarily for the prosecution or defense of the Corporate Dissolution and/or the PGD lawsuits;

(g)     The estimated sum of $216,224 for the value of all expenses and employees used by Arribas for his personal affairs and matters.

## SECOND CAUSE OF ACTION
### (Stockholder's Suit for Breach of Fiduciary Duties and the Certificate of Incorporation)

79.     The foregoing allegations are incorporated and repeated in connection with this Second Cause of Action.

80.     Arribas' breach of his fiduciary duties as claimed above, caused Llorens damages represented by a loss of dividends and income from the corporation, reductions in the corporation's net worth, and the loss of funds expended by Llorens in the defense of the PGD case, and the prosecution of his application for corporate dissolution.

81.     PGD's Certificate of Incorporation, an agreement between the two incorporators and stockholders of PGD, creates fiduciary duties owed directly to PGD's stockholders, and allow for such claims to be made for their breach by the stockholders directly.

82.     For which, Llorens' direct damages are at least the following:

(a)     PGD's reduction in net worth of $1,574,069, as of December 31, 2012;

(b)     Loss of the $500,000 Swiss Caps settlement proceeds;

(c)     Loss of dividends or compensation that PGD should have paid Llorens pursuant to the Stockholder's Agreement, or 50% of all sums collected by Arribas from the corporation ($1,699,069), or the sum of $895,535;

(d)     The costs and expenses personally incurred by Llorens to defend against PGD's frivolous lawsuit initiated by Arribas, and to prosecute a summary

dissolution proceeding in the face of an opposition unlawfully financed by PGD. Such damages as of this date are the sum of $428,015;

(e)    Severe emotional distress and mental anguish caused by Arribas' intentional conduct. Such damages are estimated in an amount no less than $1,000,000.00.

## THIRD CAUSE OF ACTION
### (Breach of the Stockholder's Agreement and Other Agreements Between the Stockholders)

83.    The foregoing allegations are incorporated and repeated in connection with this Third Cause of Action.

84.    Upon the inception of PGD, Llorens and Arribas agreed that all dividends and net income of PGD would be shared among the two stockholders in equal shares (the Stockholder's Agreement).

85.    Commencing in February of 2006, the stockholders further agreed that, henceforth, salaries and other income would not be paid to either of the two stockholders until PGD's situation caused by its loss of suppliers improved.

86.    At no time during PGD's existence were any of the foregoing agreements between the stockholders ever voided, left without effect, or terminated by any subsequent stockholder agreements.

87.    Arribas breached the foregoing agreements between stockholders by receiving from PGD, during the period up to December 31, 2012, the sum of $895,745 by way of salaries, expenses, rentals and loans.

88.     Arribas breached the foregoing agreements between stockholders by not paying Llorens his share of all sums taken by Arribas from PGD, for the foregoing concepts.

WHEREFORE, it is most respectfully requested that this Complaint be granted and judgment be entered in Plaintiffs' favor, as follows:

1.     In connection with the First Cause of Action, ordering Defendant, Arribas, to pay to Plaintiff, PGD, the sum of $3,773,130.00, in addition to Plaintiff's attorney's fees and expenses;

2.     In connection with the Second Cause of Action, ordering Defendant, Arribas, to pay Plaintiff, Llorens, the sum of $4,397,619.00, in addition to Plaintiff's attorney's fees and expenses;

3.     In connection with the Third Cause of Action, ordering Defendant, Arribas, to pay Plaintiff, Llorens, the sum of $895,745.00, in addition to Plaintiff's attorney's fees and expenses.

4.     Such other and further relief as justice, and the facts and circumstances of this case may require.

## VERIFICATION

I, José C. Llorens, the Plaintiff in this case, declare under the penalties of perjury that the foregoing factual pleadings are true, based upon my best information and belief, excepting allegations that merely contain conclusions of law developed by counsel and/or financial information developed or obtained from PGD's financial records and expert's reports.

In San Juan, Puerto Rico, this 26th day of September 2013.

_____
JOSÉ C. LLORENS

## CERTIFICATION OF SERVICE

I hereby certify that on this same date, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF System.

In San Juan, Puerto Rico, this 30th day of September 2013.

> BONETA & NOGUERAS, LLC
> PO BOX 195444
> SAN JUAN, PR 00919- 5444
> Tel. (787) 751-9393
> Fax (866) 280-7989
>
> S/Roberto Boneta
> USDC No. 115212
> rb@bnlawpr.com
>
> S/María S. Hopgood
> USDC No. 217011
> mhopgoodmatias@gmail.com

19